**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SPARK THERAPEUTICS, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 21-00705-WCB |
| | § | |
| BLUEBIRD BIO, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Spark Therapeutics, Inc.'s Motion for Preliminary Injunction. Dkt. No. 18. The motion is DENIED.

I.  Background.

On May 17, 2021, Spark Therapeutics, Inc., ("ST") brought this action against bluebird bio., Inc., ("bluebird"). Spark's complaint alleged that bluebird had engaged in trademark infringement, unfair competition, and domain name piracy in violation of the Lanham Act, 15 U.S.C. §§ 1114(a), 1125(a), and 1125(d). The complaint also alleged several violations of Delaware law: trademark dilution, in violation of Del. Code Ann. tit. 6, § 3313; deceptive trade practices, in violation of Del. Code Ann., tit. 6, § 2532, and common law trademark infringement and unfair competition. Dkt. No. 1.

In the complaint and a subsequent statement filed pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, ST charged bluebird with violating ST's rights with respect to (1) ST's federally registered marks "SPARK" and "SPARKMEDICAL.COM"; (2) ST's common law trademark "SPARKMEDICAL.COM"; and (3) ST's common law trademarks and trade names

"SPARK" and "SPARK THERAPEUTICS" (including a design incorporating the mark "SPARK THERAPEUTICS").   Dkt. No. 41.   These marks are collectively referred to as the "SPARK marks."[1]   Specifically, ST objects to the prominent use of the word "spark" in bluebird's educational "Be the Spark" campaign that is addressed to combatting sickle cell disease.

On August 6, 2021, ST filed a motion for a preliminary injunction seeking to enjoin bluebird's use of the SPARK marks in its educational campaign, Dkt. No. 18, and submitted a brief in support of its motion, Dkt. No. 19.   ST predicated its motion on its claim that bluebird's use of the word "spark" in its educational materials was likely to dilute ST's SPARK marks, in violation of the anti-dilution provision of the Delaware Trademark Act, Del. Code Ann., tit. 6, § 3313, and that bluebird's use of the SPARK mark was likely to cause confusion in the marketplace, in violation of sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114(a) and 1125(a).   Bluebird filed a response, Dkt. No. 26, and ST filed a reply, Dkt. No. 32.   After the court directed ST to submit a more definite statement under Fed. R. Civ. P. 12(e), Dkt. No. 40, bluebird was permitted to file a surreply brief with a surreply expert report, Dkt. Nos. 44 and 45, to which ST responded.   Dkt. No. 48.   A hearing on the motion for a preliminary injunction was held on January 19, 2022.

ST and bluebird are both engaged in research and development of gene therapies for inherited diseases.   In 2017, ST became the first company to receive FDA approval for a gene therapy for an inherited disease—blindness caused by a specific genetic mutation.   Dkt. No. 26 at 5; Dkt. No. 20 at 2.   More recently, ST has sought to develop a treatment for Hemophilia A, a blood-clotting disorder with genetic origins.   In addressing that condition, ST represents that it has

---

[1]   In order to avoid confusion between the plaintiff, Spark Therapeutics, Inc., and the SPARK marks that are at issue in this case, Spark Therapeutics, Inc., is referred to in this memorandum opinion and order as "ST."

"work[ed] with hematology-oncologists throughout the United States and the world to recruit patients and conduct clinical trials for its therapies to treat patients with Hemophilia A."  Dkt. No. 19 at 2.  ST states that as a part of its educational efforts, it has displayed the SPARK marks at various conferences, educational symposiums, and informational booths directed at hematology-oncologists.  *Id.*

Bluebird focuses its gene therapy efforts primarily on four diseases, one of which is sickle cell disease ("SCD"), a condition that has a disproportionate impact on African Americans.  Dkt. No. 26 at 4.  Although bluebird's SCD therapy is still in development, it has created an educational campaign featuring its intention "to serve the SCD community."  *Id.* at 7.  As part of that effort, bluebird created its "Be the Spark" educational campaign, which seeks to "spark" awareness and action regarding SCD.  Bluebird represents that its "Be the Spark" campaign has "nothing to do" with Spark Therapeutics, Inc.  *Id.*

As described in ST's papers, bluebird's educational campaign consists primarily of three components: a patient website (www.sparksicklecellchange.com), a video posted on the patient website and elsewhere, and a website for physicians (www.changeforscd.com).  *Id.*  The first two of those components use the word "spark."  *Id.*

The patient website contains several uses of the word "spark."  In the website header, the phrase "Be the Spark" appears, with the word "Spark" being featured.  Dkt. No. 22, Exh. I.  In an earlier version of the patient website, the symbol "TM" appeared in small font to the right of the word "Spark," but that symbol has recently been removed.  *Id.*  The patient website features the title "Let's spark change in sickle cell," with the word "spark" in gold lettering.  Additionally, the phrase "Sign up to be the spark" appears twice in the website.  *Id.*  The "Tools & Guides" page of the website offers links to three downloadable brochures that are each identified with a phrase that

3

includes the word "spark": "Spark Good Care Guide"; "Spark Sickle Cell Understanding Brochure"; and "Spark Sickle Cell Infographic Brochure."  Two of the brochures contain the word "spark" in large gold text on their covers.  Dkt. No. 22, Exh. K.  The word "spark" is also used in textual sentences throughout the patient website; in those cases, the word "spark" is not styled differently from the surrounding text.

The video, which is titled "Be the spark!  Change for sickle cell starts today," also features several uses of the word "spark."[2]  ST points to several instances in which the word "spark" is displayed on its own.  Dkt. No. 19 at 4.  In those instances, the word "spark" is displayed alone for less than a second before additional text appears next to the word "spark."  The result is a display of a series of phrases: "Spark Pride"; "Spark Understanding"; "Spark Courage"; "Spark Action"; "Spark Hope"; and "Spark Change."  The word "spark" is displayed in gold in that sequence of phrases, which distinguishes it from the other text on the screen.  Near the end of the video, one of the speakers asks, "I am the spark—are you?"  The words "Be the spark for change in Sickle Cell" then appear.  At the end of the video, bluebird bio is identified as the source of the content in the video.

Currently, the website for physicians does not contain references to the word "spark."  The site branding refers to "Change for SCD," and the site is titled "We Can Change SCD."  At the time the preliminary injunction motion was filed, the "Resources" page of the website for physicians contained two references to the "Be the Spark" campaign.  Dkt. No. 22, Exh. N at 2.  First, the page displayed a link to the "Spark Sickle Cell Understanding" patient brochure along with an image featuring the word "spark" in prominent gold text.  *Id.*  Second, the page contained

---

[2]  The parties have directed the court to the contents of the video, which is found on the Internet.  The video is at https://www.youtube.com/watch?v=HQuScGas_xA, and has been treated as an exhibit by the parties.  *See* Dkt. No. 27, Exh. A.

a link to the "Be the Spark patient website" accompanied by a small "Be the Spark" logo.  *Id.*  The links to the patient brochure and the patient website now appear to have been omitted from the website for physicians, so that the physicians' website no longer contains any references to the word "spark."  For purposes of this motion, I will consider the physicians' website as it now stands, not as it was at the time the motion was filed.

II.   Legal Standard

A preliminary injunction is an "extraordinary remedy, which should be granted only in limited circumstances."  *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citation omitted).  "Thus it often is said that a preliminary injunction never may be obtained as a matter of right."  11A Charles Alan Wright, Federal Practice & Procedure § 2948 at 118–19 (3d ed. 2013).

A plaintiff seeking a preliminary injunction must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  As the Supreme Court has noted, a preliminary injunction is "a drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948 at 119–22 (3d ed. 2013)) (emphasis in original); *Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir. 2018) (same); *Vertigo Media, Inc. v. Earbuds Inc.*, C.A. No. 21-120, 2021 WL 4806410, at *5 (D. Del. Oct. 14, 2021).

The Third Circuit has construed the likelihood of success on the merits to mean a reasonable probability of eventual success in the litigation; it does not mean that the party seeking

the injunction must show that it is more likely than not to succeed on the merits of its claim. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176, 179 & n.3 (3d Cir. 2017) (citing *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc), and *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). That is to say that the movant is required to demonstrate "that it can win on the merits (which requires a showing significantly better than negligible, but not necessarily more likely than not)." *Reilly*, 858 F.3d at 179; *see also Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021); *Cigar Ass'n of Am., Inc. v. City of Philadelphia*, No. 20-3519, 2021 WL 5505406, at *2 (3d Cir. Nov. 24, 2021).

In addition to showing a likelihood of success on the merits, Third Circuit law requires the movant to demonstrate that it is more likely than not to suffer irreparable harm in the absence of relief. *Reilly*, 858 F.3d at 179. A showing of a likelihood of success on the merits and the probability of irreparable harm if relief is not granted are mandatory factors; if the movant fails to make either showing, the motion for a preliminary injunction must be denied. *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015). If those two factors are established, the court is required to consider the remaining two factors—the balance of the equities and the public interest. The court must then determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179.

III.   Likelihood of Success on the Merits

To obtain a preliminary injunction, ST must first establish that it is likely to succeed on the merits of its likelihood of confusion claim under the Lanham Act or its trademark dilution claim under the Delaware Trademark Act. Based on ST's showing on the limited record developed in the preliminary injunction proceedings, and in light of the governing standard set forth in *Reilly v.*

6

*City of Harrisburg*, I find that ST has established a likelihood of success as to both its Lanham Act claim and its trademark dilution claim.

### A.   Likelihood of Confusion Under the Lanham Act

ST argues that bluebird's use of the word "spark" in its educational materials creates a likelihood of confusion with ST's registered SPARK marks, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  To prove a violation of that provision, ST must show that it owns a valid trademark and that bluebird's use of the mark is likely to cause consumer confusion. *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 319 (3d Cir. 2015).  The Lanham Act extends to "confusion, mistake, or deception of any kind, not merely of purchasers nor simply as to source of origin."  *Id.* at 322 (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 711 (3d Cir. 2004)) (emphasis omitted).

As a threshold matter, ST owns valid and protectable marks.  ST owns federal registrations for SPARK (Registration No. 5,068,997) and SPARKMEDICAL.COM (Registration No. 6,404,122).[3]  A federal registration is prima facie evidence of ownership and validity.  15 U.S.C. § 1057(b).  Bluebird does not appear to dispute either of those propositions.

In the Third Circuit, courts evaluate whether there is a likelihood of confusion by applying the ten so-called *Lapp* factors.  *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983); *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000) (adapting

---

[3] SPARK is registered for "biologic preparations for use in the diagnosis and treatment of retinal degenerative and hematologic disorders and diseases" in Class 5.  SPARKMEDICAL.COM is registered for "[e]ducational materials in electronic form, namely, downloadable slides, letters, and brochures pertaining to gene therapy research and products" in Class 9; "[p]roviding information and a website featuring information about gene therapy research" in Class 42; and "[p]roviding information and a website regarding medical resources in the field of gene therapy and medical information [and] providing a website featuring educational information in the field of gene therapy" in Class 44.  Dkt. No. 22, Exh. A.

the *Lapp* factors to account for competing goods).  The ten factors are: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market. *A & H*, 237 F.3d at 215.

As the Third Circuit has observed, not all of the *Lapp* factors "will be relevant in all cases." *Id.*  Several of the factors are relevant to this case, and each of the relevant factors is addressed below.

### 1. Similarity of the Marks

The first *Lapp* factor is the degree of similarity between the owner's mark and the alleged infringing use of that mark.  ST alleges that bluebird uses, and has applied to register, the SPARK mark as the dominant portion of slogans used in its educational campaign, including BE THE SPARK FOR BETTER CARE IN SICKLE CELL; I AM THE SPARK; SPARK CHANGE; SPARK ACTION; and SPARK UNDERSTANDING.  Bluebird responds that the overall commercial impression of ST's marks is not the same as bluebird's use of the word "spark" in its

educational materials, because in bluebird's campaign the word "spark" is paired with other words in its slogans relating to SCD rather than being presented "alone and identical" to ST's SPARK mark.  Dkt. No. 26 at 16.

The Third Circuit has observed that "adding descriptive or non-descriptive matter" to the dominant portion of a mark does not allow an infringer to avoid a finding of likely confusion. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994) (citation omitted). Although bluebird's use of the word "spark" on its own is limited to fleeting displays in its video, the word "spark" remains the dominant word in other portions of bluebird's materials.  For example, in bluebird's patient website, the word "spark" is frequently presented in gold text that is larger than the surrounding language.  Dkt. No. 22, Exh. I ("BE THE SPARK" in the website header), Exh. K (graphics on the "Tools & Guides" page of the website).

The fact that the word "spark" is used in combination with other less dominant words does not, in itself, distinguish bluebird's use of the word "spark" from the SPARK marks owned by ST. What is important, however, is that the word "spark" in bluebird's educational materials is used not as a proper noun, but as a common noun or a verb in sentences such as "BE THE SPARK" and "SPARK ACTION."  Bluebird's use of the term "spark" in that manner serves to distinguish bluebird's use of the word "spark" from ST's SPARK marks, in which the word "spark" is used as a proper noun to identify Spark Therapeutics, Inc.  There is a significant difference between ST's use of the term SPARK as a proper noun and the use of the common word "spark" to describe the objectives of bluebird's educational campaign.  For that reason, even though the word "spark" is used by both parties, the different manner in which the word is used by each party lessens the effective similarity between the two.

By analogy, the use of the word "dawn" in the phrase "dawn of a new era" in an advertisement for a novel type of automatic dishwasher would not likely be viewed as similar to the term "dawn" as used in Dawn liquid dish soap, even though naming the new dishwasher the "Dawn" dishwasher would be more problematic. Similarly, the use of the phrase "Refresh your Kitchen!" as a slogan for a home improvement company would not likely be viewed as similar to the word "refresh" when used in the name of a company such as "Refresh Renovators" involved in the same business. Or, to take another example, if JetBlue Airways were to adopt the slogan "Let us SPIRIT you away to the sunny Caribbean," it is unlikely that Spirit Airlines could successfully claim that JetBlue was infringing Spirit's rights in its trade name.

ST suggests that bluebird could have substituted a word such as "incite" in place of "spark" in its various catch phrases and could have avoided this trademark dispute. But if there were another company in the healthcare field named "Incite" (or its homonym "Insight"), ST's argument in this case would appear to apply there as well, barring bluebird from using the term "incite" in its educational campaign even as a common noun or verb. That argument sweeps too broadly, as it would allow parties to allow parties to foreclose others from using ordinary English words to promote their products or services. Because of the way in which bluebird uses the word "spark," the similarity between ST's SPARK marks and bluebird's use of the term is clearly more attenuated than would be the case if bluebird were using the word as a proper noun to describe its company or its services.

As a result, this factor favors a finding of likely confusion, but only slightly.

2.  Strength of the Owner's Mark

The second *Lapp* factor is the strength of the owner's mark. The strength of a mark is measured by both its conceptual strength and its commercial strength. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 184–85 (3d Cir. 2010).

A mark's conceptual strength is typically classified as falling into one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Id.* at 185. ST argues that the SPARK mark is arbitrary. Dkt. No. 19 at 7; Dkt. No. 22, Exh. F, at ¶ 5. That characterization, however, is unconvincing. An arbitrary mark is one that "neither describe[s] nor suggest[s] anything about the product." *Id.* Yet ST's expert, Dr. Susan Schwartz McDonald, notes that the term SPARK connotes "energy and transformation," which is "especially apt . . . for a true innovator." Dkt. No. 22, Exh. F, at 3. The use of the term "spark" thus appears to be intended to evoke "imagination, thought, or perception" in the mind of the consumer regarding the cutting-edge nature of Spark's gene therapy products. *See Sabinsa*, 609 F.3d at 185. For that reason, the mark is best characterized as suggestive. As such, it is still distinctive, but it is not as strong as an arbitrary or fanciful mark.

ST has also presented evidence regarding the commercial strength of the SPARK marks. *See* Dkt. No. 48, Exhs. 13–18. ST notes that its mark is renowned in the field of gene therapy due to ST's success in obtaining the first FDA-approved directly administered gene therapy for inherited diseases. Dkt. No. 19 at 11–12. ST adds that its mark is "particularly strong in the blood disorder field" due to its efforts to develop a gene therapy for Hemophilia A. *Id.* at 12. ST cites Dr. McDonald's report for the proposition that there is "universal awareness of Spark Therapeutics and its SPARK marks among target customers." Dkt. No. 22, Exh. F., at 10.

In response, bluebird points to what it claims to be "more than 1400 live registrations or applications containing SPARK alone or with other terms." Dkt. No. 26 at 17. Bluebird also contends that the word "spark" is a weak mark not only because it is merely suggestive, but also because it is "a meaningful word in common usage." *See Kampgrounds of Am., Inc. v. N. Del. A-OK Campground, Inc.*, 415 F. Supp. 1288, 1294 n.4 (D. Del. 1976), *aff'd*, 556 F.2d 566 (3d Cir. 1977).

There is considerable force to bluebird's point. Because ST's SPARK marks incorporate a common English word, those marks are "inherently weaker than a mark consisting of fanciful and fictitious terms." *Michael Caruso & Co. v. Estefan Enters., Inc.*, 994 F. Supp. 1454 (S.D. Fla.), *aff'd sub nom. Caruso v. Estefan*, 166 F.3d 353 (11th Cir. 1998); *see Sun Banks of Fla.. v. Sun Fed. Savs. & Loan*, 651 F.2d 311, 316 (5th Cir. 1981); *Alpha Indus., Inc. v. Alpha Tube & Shapes, Inc.*, 616 F.2d 440, 445–46 (9th Cir. 1980) (a mark that is "a meaningful word in common usage" is weak); *Esquire Inc. v. Esquire Slipper Mfg. Co.*, 243 F.2d 540, 543 (1st Cir. 1957) ("We do not think a trader can pluck a word with favorable connotations for his goods or services out of the general vocabulary and appropriate it to his exclusive use no matter how much effort and money he may expend in the attempt."). Nonetheless, in assessing the strength of Spark's mark, it is important to note that the mark is best characterized as suggestive. As such, although it is weaker than an arbitrary or fanciful mark would be, it is stronger than a mark that is merely descriptive or generic. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).

Bluebird does not contend that companies using other marks containing the word "spark" or variants thereof are all engaged in the same fields of medical research and treatment as ST and bluebird. However, bluebird argues that many uses of the term "spark" occur "in the medical and

12

educational fields." Dkt. No. 26 at 17. One such example cited by bluebird is a research organization with the name "Spark" that is investigating the use of genetics to treat autism. *Id.*

In general, "widespread use of even a distinctive mark may weaken the mark." *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 123 (3d Cir. 2004); *see also Sun Banks*, 651 F.2d at 316 (noting that "extensive third-party use of the word 'Sun'" weighed against a finding of likelihood of confusion). Although the mere existence of other registrations is not conclusive proof of third-party use, *Theia Techs. LLC v. Theia Grp.*, *Inc*., No. CV 20-97, 2021 WL 291313, at *25 (E.D. Pa. Jan. 28, 2021), bluebird's references to the numerous marks using the word "spark" suggest that the word "spark" is not uncommonly used by third parties for trademark purposes. Moreover, the frequency with which the term "spark" is used in commerce reinforces the point that the SPARK marks are weaker than marks that are arbitrary or fanciful. On balance, however, ST's SPARK marks are sufficiently strong that the "strength" factor cuts somewhat in ST's favor on the issue of the likelihood of confusion.

### 3.  Price of the Goods and Consumer Sophistication

The third *Lapp* factor is the price of the goods or services at issue and other factors indicative of the care and attention expected of consumers when making a purchase. The price of a single gene therapy treatment is extremely high and can at times approach or even exceed $1,000,000. *See* Dkt. No. 22, Exh. E. In bluebird's view, doctors selecting and prescribing a gene therapy treatment would "exercise a very high degree of care and attention" in making such a decision, and the decision would not be "based in any way on an educational campaign for SCD just because it contains" the word "spark." Dkt. No. 26 at 17–18. I agree that the high price of gene therapy treatments and the fact that such treatments are relatively new to the medical field indicate that physicians will exercise an extremely high degree of care when prescribing or

recommending any gene therapy that might be offered by ST or bluebird.  A physician making such a decision will almost certainly be familiar with both the product and the company offering it, which further reduces the risk of confusion based on bluebird's use of the word "spark" in its educational materials directed to SCD patients.  Dkt. No. 27 at 11.

In response, ST argues that while medical professionals may be highly sophisticated with regard to the treatments themselves, they are not likely to be sophisticated with regard to issues such as partnerships, acquisitions, and mergers among drug companies and therefore may be misled as to affiliation by bluebird's use of the word "spark" in connection with its campaigns. Dkt. No. 19 at 16 (citing *Kos*, 369 F.3d at 717).  In making that argument, ST relies on the statements in *Kos* that "medical expertise as to products will [not] obviate confusion as to source or affiliation," and that "even a high degree of care would have little effect on confusion of sponsorship." *Id.* (citation omitted).

*Kos* is distinguishable for two reasons.  First, the court in *Kos* based its analysis of this *Lapp* factor in part on the fact that confusion on the part of physicians or pharmacists leading to mistakes in prescribing or dispensing medicines could have "serious consequences for the patient." *Id.* at 716 (citation omitted).  That concern is less relevant in this case, because ST and bluebird do not offer products that compete directly.  ST is developing a gene therapy treatment for hemophilia, whereas bluebird is developing a gene therapy treatment for SCD (among other diseases), and neither treatment is currently being offered in the marketplace.  Thus, the likelihood that a hematologist would be confused between therapies offered by bluebird and ST in a way that would result in physical harm to a patient is extremely low, particularly during the relatively brief period that would be covered by a preliminary injunction.

14

Second, while it is possible that hematologists who exercise a high degree of care in selecting particular treatments may be confused as to sponsorship or corporate affiliations, *see Kos*, 369 F.3d at 717, that possibility seems quite remote under the circumstances of this case, where the therapies are novel and the conditions treated by the two companies do not overlap. In *Kos*, the plaintiff presented evidence that doctors mistakenly identified the plaintiff's products as the defendant's products, and vice versa. *Id.* at 706. Here, there is nothing in the record to suggest that any doctors have mistakenly believed that bluebird's SCD awareness campaign is indicative of a collaboration with ST, or that any are likely to do so in the future. Considering the seemingly low risk of confusion as to sponsorship or affiliation in light of the extremely high degree of care that physicians and patients are likely to use in selecting a gene therapy product and provider, this factor favors a finding of no likelihood of confusion.

### 4. Actual Confusion

The fourth *Lapp* factor is the length of time the defendant has used the mark without evidence of actual confusion arising. Relatedly, the sixth *Lapp* factor is the evidence of actual confusion. A plaintiff is not required to provide evidence of actual confusion to prevail on a likelihood of confusion claim, particularly in cases in which the allegedly infringing use has taken place over only a short period of time. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991); *PB Brands, LLC v. Patel Shah Indian Grocery*, No. CIV.A. 07-4394, 2008 WL 2622846, at *9 (D.N.J. June 27, 2008), *aff'd*, 331 F. App'x 975 (3d Cir. 2009). Nonetheless, the presence or absence of actual confusion is relevant to the likelihood of confusion against which the Lanham Act is designed to protect.

Bluebird initiated its "Be the Spark" campaign in April 2020. Dkt. No. 26 at 7. ST asserts that it did not learn of the campaign until May 2021, more than a year after the campaign began.

Dkt. No. 21 at 4.  ST has not presented any evidence of actual confusion.  The absence of evidence of actual confusion is not necessarily fatal to ST's claim given that bluebird's "Be the Spark" campaign has been in place for less than two years.  However, the fact that bluebird engaged in its campaign for more than a year before ST even learned of the campaign suggests that there is, at most, only a limited risk of confusion in this case.  *See Zaletel v. Prisma Labs, Inc.*, No. CV 16-1307, 2017 WL 877302, at *5 (D. Del. Mar. 6, 2017) ("[T]he lack of actual confusion evidence can lead to an inference that continued use will not lead to consumer confusion."); *see also Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270 (3d Cir. 2001) (holding that the district court did not err in finding "the parties' co-existence for over five years" to weigh "strongly" against likelihood of confusion).  As a result, this factor weighs against a finding of likely confusion.

### 5.  Defendant's Intent

The fifth *Lapp* factor is the intent of the defendant in adopting the mark, i.e., whether the defendant acted with predatory intent to benefit from the goodwill attached to the plaintiff's mark.  The Third Circuit has noted that the "defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." *A&H*, 237 F.3d at 226 (emphasis in original).  The Third Circuit has also noted that "[t]he adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant." *Kos*, 369 F.3d at 721; *see also Fisons*, 30 F.3d at 480.  ST argues that bluebird undeniably knew of ST and, at minimum, had constructive knowledge of ST's federal trademark registrations.  Dkt. No. 19 at 15.  In response, bluebird argues that it had no reason to suggest any affiliation between its "Be the Spark" campaign and ST.  Bluebird asserts that its campaign is part

16

of a "good faith" effort to "help the SCD community," and that the campaign has "nothing whatsoever to do with" ST.  Dkt. No. 26 at 18.

There is no evidence that bluebird has used the word "spark" as part of an effort to promote confusion or to trade on ST's reputation.  Nor do the circumstances suggest any such predatory intent on bluebird's part.  In particular, it is notable that bluebird is not using the word "spark" with respect to any gene therapy product that it has on the market, and its campaign is directed primarily toward the SCD community, which is not specifically targeted by ST's activities.  Given that the disease that is the subject of bluebird's campaign is distinct from any of the diseases ST has addressed in its research, and that other than the use of the word "spark," bluebird's educational efforts have not mimicked the SPARK marks in any way, the intent factor weighs against a finding of likelihood of confusion.  *See, e.g.*, *GOLO, LLC v. Goli Nutrition Inc.*, No. CV 20-667-RGA, 2020 WL 5203601, at *8 & n.11 (D. Del. Sept. 1, 2020) (finding the intent factor to weigh against a likelihood of confusion and noting that, under Third Circuit law, the intent factor can favor the defendant).

As for ST's contention that bluebird was careless in failing to conduct an adequate investigation regarding the potential conflict between the SPARK marks and bluebird's "Be the Spark" campaign, that argument is unpersuasive.  Although bluebird may have been aware of the SPARK marks before initiating its campaign, bluebird's use of the "spark" slogans is limited to its use in connection with its educational campaign directed to SCD patients.  Even if bluebird conducted a trademark search, it could reasonably have concluded that it was entitled to use the term "spark" in the manner that it has.  Because there is no evidence in the record that ST failed to conduct an adequate investigation prior to initiating its "Be the Spark" campaign, bluebird's

possible knowledge of ST's SPARK marks does not tip this factor in ST's favor.  The "intent" factor therefore favors bluebird.

### 6.   Similarity of Trade Channels and Consumers

ST argues that bluebird and ST direct their promotional efforts at the same group of customers—medical professionals who specialize in rare blood disorders and patients suffering from those diseases.  In addition, ST argues that the two companies employ similar marketing strategies, i.e., Internet-based promotional and educational campaigns promoting the use of gene therapy for inherited blood disorders.  The degree of overlap of targets and marketing techniques, Spark argues, "will naturally lead to 'an assumption of common source affiliation or sponsorship.'" Dkt. No. 19, at 14–15 (quoting *Kos*, 369 F.3d at 723).

Bluebird responds that ST and bluebird do not operate in the same channels of trade and do not target the same consumers.  In particular, Bluebird contends that its "Be the Spark" campaign is directed to very different audiences than the physicians and patients to whom ST's marketing efforts are directed.  Dkt. No. 26 at 18.  Moreover, according to bluebird, any suppositions about ST's future target markets and future competitive relationship with bluebird are "entirely speculative."  *Id.*

It is true that neither company currently sells a product or service in the field in which ST argues their research activities most directly overlap—the treatment of genetically based hematological disorders.  Even though the parties do not currently market products in overlapping fields, ST contends that their educational campaigns and other advertising efforts are likely to reach many of the same consumers, particularly to the extent that the companies' marketing and educational efforts are directed to physicians in general and hematologists in particular.

Importantly, the limited record presented in the preliminary injunction proceedings indicates that any overlap in trade channels and consumers applies only to physicians; the companies conduct research and treatment directed to quite different diseases and groups of patients.  Yet of the bluebird websites and video material that ST has presented in its preliminary injunction motion, the only materials that use the word "spark" are those directed to patients and members of the sickle cell community.  Bluebird's website that is directed to physicians does not use that word.[4]  For that reason, the persons for whom the two companies activities overlap—physicians in general and hematologists in particular—are not the targets of bluebird's "Be the Spark" campaign, and the persons to whom the "Be the Spark" campaign is directed are not likely to be familiar with ST.[5]  Therefore, even though the two companies focus at least some of their efforts on blood disorders, and it is likely that at least some hematologists will be aware of both companies, the overlap in channels of trade and consumers with respect to the use of the term "spark" does not appear to be significant.

As for the fact that both companies produce educational videos and use the Internet, that form of communication with customers is so universal that it does not count for much.  And for purposes of assessing the motion for a preliminary injunction, which is a request for only short-term relief, the court's principal concern is with current conditions, not with conditions that may develop years in the future.

---

[4]  As noted, the bluebird website that is directed to physicians, as opposed to the SCD community, does not use the word "spark."  Links to the patient website that were previously included in the physician's website have been removed.

[5]  ST has also pointed out that the "Sign up to be the spark" page on bluebird's patient website allows visitors to identify themselves as "healthcare provider[s] who treat[] sickle cell."  That single reference on one page of the site is insufficient to establish that medical providers are the target of bluebird's campaign, especially given the lack of evidence that such providers have visited the patient website or are even aware of bluebird's campaign.

For those reasons, this factor cuts in favor of bluebird.

### 7. Fair Use

In addition to its arguments regarding the *Lapp* factors, bluebird also raises the defense of fair use. Under the Lanham Act, it is a defense to trademark infringement for a defendant to use a plaintiff's mark "otherwise than as a mark" if that use "is descriptive of and used fairly and in good faith only to describe the goods or services of such party." 15 U.S.C. § 1115(b)(4). To establish fair use, bluebird must establish that it (1) used the contested term merely descriptively, (2) did not use the term as a trademark, and (3) used the term in good faith. *Inst. for Sci. Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1008 (3d Cir. 1991).

ST's primary argument regarding fair use is that bluebird is using the term "spark" for a trademark purpose, i.e., to identify a good or service. Bluebird denies that it has used the word "spark" for such a purpose. When a common word is employed for a non-trademark purpose, the word is less likely to cause confusion as to source. *See Car-Freshener Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995) ("It is a fundamental principle marking an outer boundary of the trademark monopoly that, although trademark rights may be acquired in a word or image with descriptive qualities, the acquisition of such rights will not prevent others from using the word or image in good faith in its descriptive sense, and not as a trademark. . . . The principle is of great importance because it protects the right of society at large to use words or images in their primary descriptive sense, as against the claims of a trademark owner to exclusivity."); *Castro v. Entrepreneur Media, Inc.*, No. 1-10-CV-695, 2011 WL 13234330, at *3 (W.D. Tex. Apr. 28, 2011) ("[T]he Lanham Act does not limit the use of common English words when those words are used in their descriptive or dictionary sense and not in a trademark sense."); *cf. Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1211 (S.D.N.Y. 1979) ("[I]t is highly doubtful

20

whether a single entity in commerce should be granted the exclusive right to use a name consisting of common English words which describe or evaluate the claimed virtues of the product.").

ST points out that bluebird has applied to register as trademarks the phrases "BE THE SPARK"; "I AM THE SPARK"; "SPARK CHANGE"; and "SPARK ACTION." Dkt. No. 22-2, Exh. B. In addition, the evidence shows that at one point Bluebird attached the symbol ™ to the phrase "Be the Spark" in its educational materials. *See* Dkt. No. 22-11, Exh. I at 1; *id.,* Exh. K at 1.[6]

Evidence that an alleged infringer sought to register a term with the Patent and Trademark Office ("PTO") is evidence that the defendant is using the term as a trademark. *See, e.g.*, *Adjusters Int'l, Inc. v. Pub. Adjusters Int'l, Inc.*, No. 92-CV-1426, 1996 WL 492905, at *15 (N.D.N.Y. Aug. 27, 1996) (attempts to register name as a trademark were "highly persuasive, if not conclusive, evidence that defendants were using the [name] in a trademark sense"); *Mortg. Elec. Registration Sys., Inc. v. Brosnan*, No. C 09-3600, 2009 WL 3647125 (N.D. Cal. Sept. 4, 2009) ("Defendants are using [plaintiff's] name as their own mark, as shown by the fact that [one defendant] applied to register the name with Patent and Trademark Office."); *Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 5 F. Supp. 3d 1368, 1377 (S.D. Fla. 2014) (finding that the defendant's use was as a trademark, in part because the defendant applied to use the plaintiff's name as a trademark); *Feathercombs, Inc. v. Solo Prods. Corp.*, 306 F.2d 251, 256 (2d Cir. 1962) ("If a competitor of a trade-mark owner seeks registration of the mark, that would be conclusive evidence of his intent to make a trade-mark use thereof.") (citation omitted).

---

[6] The symbol ™ has recently been removed from the phrase "Be the Spark" in bluebird's educational materials.

On the other hand, it is noteworthy that bluebird's claim of trademark status is attached to the listed phrases, and not to the word "spark" alone.[7]  Bluebird argues that the use of the ™ symbol does not preclude a finding that its use of "spark" is descriptive.  *See, e.g.*, *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 598 (7th Cir. 2019) (holding that the use of "Sport Fuel" in a slogan for Gatorade was descriptive despite the use of a ™ symbol along with the slogan).  Therefore, bluebird's assertion that it enjoys trademark rights in certain phrases containing the word "spark" is not necessarily inconsistent with bluebird's fair use defense.

Bluebird notes that the PTO rejected bluebird's application to register BE THE SPARK, in part because bluebird's use did not function "to indicate the source of applicant's goods and/or services and to identify and distinguish them from others."  U.S. Patent & Trademark Office, Trademark App. Ser. No. 79/302,808, Final Office Action (Sept. 11, 2021).  The PTO's rejection, however, does not provide support for bluebird's fair use defense if, as some authorities have suggested, bluebird's attempt to register the marks effectively estops bluebird from claiming that it is not using BE THE SPARK as a trademark.  *See* 6 Louis Altman & Malla Pollack, Callmann on Unfair Competition, Trademarks, and Monopolies § 22:69 & n.29 (4th ed. 2021); *Plus Prods. v. Natural Organics, Inc.*, No. Cv 81-1798, 1984 WL 33, at *3 (E.D.N.Y. Feb. 3, 1984) ("Defendant sought to register NATURE'S PLUS as a trademark.  It cannot now argue that the term is merely descriptive.").

Other authorities, however, take the opposite position, holding that estoppel is not necessarily available in such settings "where the adverse party's prior position was taken in an

---

[7]  Although ST argues (Dkt. No. 19, at 17) that bluebird's prior use of the symbol ™ on its website indicates that it is claiming the word "spark" as a trademark, the symbol appeared at the end of the phrase "Be the Spark."  In context, the symbol seems to have applied to the entire phrase, not to the word "spark" by itself.

application before the PTO, not in a controverted proceeding." *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 535 (S.D.N.Y. 2012); *see also Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 353 (E.D.N.Y. 2007).  Those authorities rely on the more general proposition that courts ordinarily do not bind parties to statements made or positions taken in ex parte trademark application proceedings before the PTO, and that judicial estoppel applies only if the prior inconsistent position is adopted by the tribunal in some way.  *See DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010); *Kaplan, inc. v. Yun*, 16 F. Supp. 3d 341, 348 (S.D.N.Y. 2014).

ST also argues that bluebird is using the word "spark" as a trademark because the word is emphasized in several of the catch phrases used in bluebird's educational materials, such as "Be the Spark" and "Spark Sickle Cell Understanding."  The word "spark" is highlighted in several places, but in all instances it appears as part of a phrase containing other words.   That is true even in cases in which the word "spark" first appears alone and then the rest of the phrase joins the word "spark," as in "SPARK . . . ACTION," "SPARK . . . CHANGE" and "SPARK . . . AWARENESS."  Although the use of the term "spark" may be understood primarily as part of a phrase urging awareness and action and not as a source identifier, the fact that the term "spark" is frequently used to attract attention could also serve as evidence that bluebird is using the term as a mark. *See, e.g.*, *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (the question whether a term is being used as a mark centers on whether the term is used "as a symbol to attract public attention").

It is not necessary to decide at this point whether bluebird will prevail on its fair use defense.  It is apparent, however, that bluebird's assertion of fair use is likely to be met with legal and factual challenges.  For that reason, while bluebird's claim of fair use poses a potential problem

for ST, the uncertainties as to the applicability of the fair use defense mean that bluebird's assertion of that defense does not substantially affect the court's assessment of whether ST is likely to succeed on the merits of its Lanham Act claim.

### 8.  Balancing the Factors

Summarizing the analysis of the applicable *Lapp* factors, several of the factors weigh in favor of a finding of likely confusion and several factors weigh against a finding of likely confusion.  As a whole, the factors do not weigh decisively in favor of either ST or bluebird.  As noted above, for purposes of its request for a preliminary injunction, ST is not required to prove that it is more likely than not that it will ultimately succeed on the merits, but it must show that it has a significantly greater than negligible chance of success.  *See Reilly*, 858 F.3d at 179.  Based on the record developed in the proceedings to date, I conclude that ST's Lanham Act claim is not particularly strong, but it is sufficient under the governing standard to support a finding that ST is likely to succeed on the merits of its likelihood of confusion claim.  It is therefore necessary to consider the remaining *Winter* factors with regard to ST's Lanham Act claim, which I address in Parts IV, V, and VI, *infra*.

### B.  Trademark Dilution Under Delaware Law

Invoking state law, ST argues that bluebird's use of the word "spark" in its educational materials results in the dilution of ST's SPARK marks within the meaning of the Delaware Trademark Act, Del. Code Ann., tit. 6, § 3313.  That Act provides, in pertinent part, that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark . . . valid at common law . . . shall be a ground for injunctive relief notwithstanding the absence of competition between the parties, or the absence of confusion as to the source of goods or services."

The Delaware statute does not define dilution.  The term, however, is generally understood to a refer to an actor's use of a designation that resembles the trademark of a second party if the use of that designation is likely to associate the second party's trademark with the goods, services, or business of the actor and either causes a reduction in the distinctiveness of the second party's mark (known as "blurring") or is likely to disparage the second party's goods, services, or business, or tarnish the images associated with the second party's mark (known as "tarnishment").  *See* Restatement (Third) of Unfair Competition § 25 (Am. Law Inst. 1995).

Dilution by blurring occurs when the defendant uses the plaintiff's trademark in a manner that results in lessening the ability of the plaintiff's mark to serve as a unique identifier of the plaintiff's product or services.  *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996); *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994).  The federal anti-dilution statute similarly defines dilution by blurring as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  Dilution by tarnishment occurs when the plaintiff's mark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context," so that "the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods."  *Deere & Co.*, 41 F.3d at 43.  The federal anti-dilution statute defines dilution by tarnishment as "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."   15 U.S.C. § 1125(c)(2)(C).  *See generally* Restatement (Third) of Unfair Competition § 25.

ST contends that bluebird has violated the Delaware anti-dilution statute by both blurring and tarnishing ST's SPARK marks.

25

1. <u>Use of the Mark</u>

As a threshold matter, bluebird argues that ST has not shown sufficient use of the SPARK marks in Delaware to establish common law rights in those marks for purposes of the Delaware anti-dilution statute.  Dkt. No. 44 at 4–5.  I disagree.  ST has submitted evidence that its marks were featured in articles and newsletters directed to the healthcare community in Delaware.  Dkt. No. 48, Exhs. 13 & 14.  ST has also presented evidence that it is a member of the DelawareBio trade group; that ST participates in DelawareBio's events; and that ST's logo is featured on the group's website.  *Id.*, Exhs. 15 & 17.  Furthermore, ST's evidence shows that practitioners in Delaware offer screening and consultations regarding ST's Luxturna gene therapy product.  *Id.*, Exhs. 16 & 18.  And finally, ST's website and other Internet materials discussing its products are accessible in Delaware.  For purposes of the motion for a preliminary injunction, that evidence supports a conclusion that ST has used the SPARK marks in Delaware to an extent sufficient to obtain common law rights in those marks for purposes of the Delaware anti-dilution statute..

2. <u>Background of Anti-Dilution Laws</u>

Before addressing the merits of ST's dilution claim, some background is required.[8]  In 1976, Delaware enacted its anti-dilution law, which is based on the 1964 United States Trademark

---

[8]  The origins of anti-dilution law have been traced by numerous commentators and courts to a 1927 article by trademark attorney Frank Schechter.  *See* Frank I. Schechter, *The Rational Basis of Trademark Protection*, 40 Harv. L. Rev. 813, 829 (1927) (arguing that trademark protection should not be limited to infringement based on the likelihood of confusion with competing goods or services, but should extend to acts that would dilute a party's trademark by eroding the "impression or symbol of the excellence of the particular product in question."); *see generally* 4 J. Thomas McCarthy, McCarthy on Trademarks §§ 24:67–24:69 (5th ed. 2021); David S. Welkowitz, Trademark Dilution: Federal, State, and International Law 7–30 (2d ed. 2012); Robert G. Bone, *Schechter's Ideas in Historical Context and Dilution's Rocky Road*, 24 Santa Clara Computer & High Tech. L.J. 469 (2008); and Jerre B. Swann, *The Evolution of Dilution in the United States from 1927 to 2013*, 103 Trademark Rep. 721 (2013).  The Supreme Court set out a brief account of the background of anti-dilution legislation in *Moseley v. V Secret Catalogue,*

Association's Model State Trademark Bill and several state statutes that were enacted prior to the 1964 Model Bill.[9]  The Delaware statute has not been amended since.  In the more than 40 years that the Delaware anti-dilution statute has been in effect, there have been only a few district court decisions applying the statute, and there are no published decisions from the Delaware state courts construing it for present purposes.  However, decisions in other states that enacted anti-dilution statutes similar or identical to Delaware's statute have provided guidance in construing the Delaware law.[10]

In 1992, the Delaware anti-dilution statute was at issue for the first time in a case brought in this district, *Barnes Group Inc. v. Connell Limited Partnership*, 793 F. Supp. 1277 (D. Del. 1992).  The *Barnes* court's statements about trademark dilution have been cited and quoted in four subsequent decisions in this district.  Those later cases, however, have not elaborated on the discussion in *Barnes*.  As a result, *Barnes* is, by default, the leading case addressing the Delaware anti-dilution statute.[11]

---

*Inc.*, 537 U.S. 418, 428–31 (2003).  Because that history has been thoroughly explored elsewhere, I will not replow that ground here.

[9]   Delaware was one of a number of states that enacted anti-dilution statutes based on or similar to the Model Bill.  By 1990, 25 states had done so.  Those states are listed in Trademark Dilution: Federal, State, and International Law 23–25, although that list omits Nebraska, which enacted a statute based on the 1964 Model Bill in 1967.  Neb. Rev. Stat. § 87-122 (1967).

[10]   The first state to enact an anti-dilution statute was Massachusetts, which enacted its anti-dilution statute in 1947.  Between 1955 and 1963, four other states—New York, Illinois, Georgia, and Connecticut—enacted similar legislation.  The New York and Massachusetts statutes in particular have generated a number of cases construing statutory language identical to that in the Delaware law.

[11]   The subsequent district court cases that have applied the Delaware anti-dilution statute and cited *Barnes* are *Military Certified Residential Specialist LLC v. Fairway Indep. Mort. Corp.*, 251 F. Supp. 3d 750, 757 (D. Del. 2017); *Treasury Mgmt. Servs., Inc. v. Wall Street Sys. Del., Inc.*, Civ. No. 16-283, 2017 WL 1821114, at *4–5 (D. Del. May 5, 2017); *Healthbox Glob. Partners, LLC v. Under Armour, Inc.*, Civ. No. 16-146, 2016 WL 3919452, at *9 (D. Del. July 19, 2016); and *Sanofi-Aventis v. Aventis Pharm. Corp.*, 453 F. Supp. 2d 834, 855 (D. Del. 2006).  None of

Because no state or federal court in Delaware had previously interpreted the Delaware anti-dilution statute, the court in *Barnes* looked to cases applying the identical language of the New York anti-dilution statute.  In particular, the court cited the Second Circuit's decision in *Mead Data Central, Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026 (2d Cir. 1989), for the proposition that the New York statute "requires that plaintiff's mark possess a distinctive quality capable of dilution and that plaintiff show a likelihood of dilution."  *Barnes*, 793 F. Supp. at 1304.  Then, citing *Mead Data* and *P.F. Cosmetique, S.A. v. Minnetonka, Inc.*, 605 F. Supp. 662 (S.D.N.Y. 1985), the court stated that "[p]roof of distinctiveness necessary to satisfy the anti-dilution statutes typically is the same proof used to show inherent or acquired distinctiveness for infringement purposes under the Lanham Act."  *Barnes*, 793 F. Supp. at 1304.  Applying that standard, the court found that the plaintiff's marks were "of sufficient distinctive quality to be subject to dilution."  *Id.*  However, the court found that because the defendant used the marks in a manner that was visually distinct from way the plaintiff displayed the marks, the record did not support a finding of dilution by blurring the identity between the plaintiff and its marks.  The court also found that there was no evidence to support a conclusion that the defendant's use of its marks would result in tarnishment of the plaintiff's mark by adversely affecting the positive impression conveyed by the plaintiff's marks.  *Id.*

ST argues that *Barnes* stands for the proposition that any mark that has inherent or acquired distinctiveness falls within the scope of the Delaware anti-dilution statute, and that it is not necessary for the mark to have an enhanced level of strength to qualify.  The court's opinion in *Barnes*, however, is somewhat cryptic regarding the degree of a mark's distinctiveness that is

---

those cases added anything new to the construction of the Delaware statute beyond what was said in *Barnes*.

necessary to result in "dilution of the distinctive quality" of the mark, which the statute requires. The statute itself does not speak to what level of distinctiveness in a mark is sufficient to give rise to a dilution claim.[12]

Shedding doubt on ST's interpretation of *Barnes* is the fact that the two New York cases that the *Barnes* court cited in support of its construction of the Delaware Trademark Act both required that the plaintiff's mark must be very strong in order to give rise to a dilution claim. *See Mead Data*, 875 F.2d at 1032–33 (mark must be "extremely strong"); *P.F. Cosmetique*, 605 F. Supp. at 672 ("only the strongest, most well-established marks are protected by [the New York anti-dilution statute] against dilution.

More generally, there is substantial authority, both in New York and elsewhere, that the statutory language taken from the 1964 Model State Trademark Bill requires an enhanced level of distinctiveness in order for a mark to qualify for protection from dilution. *See, e.g.*, *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir. 1983) (the New York anti-dilution statute "protects only extremely strong marks . . . perhaps not even all those that qualify as arbitrary or fanciful"); *Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 369 N.E.2d 1162 (N.Y. 1977) (only marks "truly of distinctive quality or which have acquired a secondary meaning in the mind of the

---

[12] ST relies on the statement in *Barnes* that the "[p]roof of distinctiveness necessary to satisfy the anti-dilution statute typically is the same proof used to show inherent or acquired distinctiveness for infringement purposes under the Lanham Act," 793 F. Supp. at 1304, and the statement in *Sanofi-Aventis* that because the Aventis mark at issue in that case "was inherently distinctive for the purpose of the plaintiff's infringement claims," the Aventis mark was distinctive for purposes of the Delaware Trademark Act. 453 F. Supp. 2d at 855. In *Barnes*, the court found, for purposes of the plaintiff's infringement claim, that its marks had acquired secondary meaning, and in *Sanofi-Aventis,* the court found, for purposes of the plaintiff's infringement claim, that its mark was both conceptually and commercially strong. In neither case did the court have to address the question whether a weaker mark, such as one that was merely suggestive, would be sufficient to support a dilution claim under the Delaware statute. Moreover, even if ST's interpretation of *Barnes* and *Sanofi-Aventis* is correct, those district court decisions are not binding precedents. While they are entitled to respectful consideration, I am not compelled to follow them.

public" are protected under the New York statute); *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 874 (9th Cir. 1999) (construing the original California anti-dilution statute, which was based on the 1964 Model Bill, "to protect only famous marks"); *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1061 (7th Cir. 1995) (Illinois anti-dilution statute requires "strong, distinctive marks with widespread recognition"); *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 697 (1st Cir. 1979) (construing the Massachusetts statute to apply only to the "strongest" trade names); *Benchmark v. Benchmark Builders, Inc.*, No. CIV 00-151, 2000 WL 1886570, at *7 (D. Me. Dec. 29, 2000) (construing Maine anti-dilution statute consistently with the construction of the corresponding Massachusetts statute; "a plaintiff cannot succeed on a theory of diminution in uniqueness and individuality of its mark when the mark in question— however distinctive for Lanham Act purposes—'is virtually a household word.'"); *Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 758 F. Supp. 512, 527–28 (E.D. Mo. 1991), *aff'd*, 989 F.2d 985 (8th Cir. 1993) (interpreting the Missouri anti-dilution statute, which incorporated the language of the 1964 Model Bill, to require that the plaintiff's mark be "arbitrary, coined, [or] fanciful," or have acquired secondary meaning) (citing *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1332 (8th Cir. 1984)); *Advantage Rent-A-Car, Inc. v. Enter. Rent-A-Car Co.*, 238 F.3d 378, 381 (5th Cir. 2001) (noting that under the initial version of the Texas anti-dilution statute, which was based on the 1964 Model Bill, "a somewhat stricter standard is to be applied in determining 'strength' in dilution analysis than in likelihood of confusion analysis").[13]

---

[13]   Citing Callmann on Unfair Competition, Trademarks, and Monopolies § 22:22, ST argued at the preliminary injunction hearing that the cases regarding the New York dilution statute "are in disarray regarding the level of strength required." While there are some cases that have not construed the New York statute to require a very strong mark, my examination of the New York cases, including the two cited by the *Barnes* court, leads me to agree with Professor Welkowitz that "the mainstream of New York law is to require a very strong mark." Trademark Dilution: Federal, State, and International Law 47.

The restrictive constructions of state anti-dilution statutes was driven in part by courts' concerns that such statutes, if construed broadly, could erode the carefully developed limitations on the scope of trademark infringement liability, resulting in the effective creation of "rights in gross" in trademarks, contrary to the basic principles underlying trademark law. *See Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449, 456 (4th Cir. 1999); Restatement (Third) of Unfair Competition § 25 cmt. b ("Some courts, and numerous commentators, expressed fear that the uncertain limits of the antidilution cause of action would unduly expand the ability of trademark owners to monopolize language and inhibit free competition. A broad antidilution theory also has the potential to render superfluous the traditional likelihood of confusion standard of liability."); 3 J. Thomas McCarthy, McCarthy on Trademarks § 24:78 (5th ed. 2021) (same).

In 1996, Congress amended the Lanham Act to add a provision creating a federal cause of action for dilution. *See* Federal Trademark Dilution Act, Pub. L. No. 104-98, § 3(a), 109 Stat. 985. That statute, however, provided that the dilution remedy is available only if the mark in question is famous. *See* 15 U.S.C. § 1125(c)(1). In 2006, Congress enacted the Trademark Dilution Revision Act, Pub. L. No. 109-312, 120 Stat. 1730, to overturn the Supreme Court's decision in *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003), in which the Court construed the 1996 Act to be limited to actual dilution rather than the likelihood of dilution. *See Moseley*, 537 U.S. at 433. The 2006 statute explicitly referred to the dilution by "blurring" and "tarnishment," the two interests that had come to be identified as the targets of anti-dilution legislation, and it added a set of six factors to be considered in determining whether the a party's use of another party's mark or tradename is likely to cause dilution by blurring. The 2006 revision also retained the provision

stating that only famous marks could qualify for anti-dilution protection. *See* 15 U.S.C. § 1125(c)(2)(B).

Contemporaneously with the addition of the requirement of "fame" for marks protected by the dilution provisions of the 1996 Model Bill and Congress's inclusion of a dilution cause of action in the Lanham Act, the American Law Institute addressed trademark dilution in the Restatement of Unfair Competition. The Restatement's anti-dilution provision advocated that the cause of action for trademark dilution be limited to marks that are "highly distinctive." Restatement (Third) of Unfair Competition § 25. The Restatement added the observation that "most courts require that the mark possess a degree of distinctiveness beyond that needed for the designation to qualify as a valid trademark." *Id.* § 25 cmt. e (1995).

A number of states, including 16 of the 25 states that initially adopted anti-dilution statutes based on the 1964 Model Trademark Bill, have now enacted or amended their anti-dilution statutes. Those new or amended statutes have been largely modeled on later versions of the Model Trademark Bill, all of which contained a heightened requirement of distinctiveness for the mark to serve as the basis for a dilution claim. Specifically, the 1996 amendments to the Model Bill required that the protected mark be "distinctive and famous," and the 2007 amendments to the Model Bill defined "famous" as "widely recognized by the general consuming public of [the] State or a geographic area in [the] State." 4 McCarthy on Trademarks §§ 24:79.50, 24:96.

The upshot of these developments is that at present, the Lanham Act contains a provision addressing dilution, 38 states have anti-dilution statutes, and one state (Ohio) has recognized a cause of action for trademark dilution as a matter of common law.[14] A heightened degree of

---

[14] *See Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 424 (6th Cir. 1999). As part of its common law cause of action, Ohio requires that the senior mark be distinctive and well known, at

distinctiveness is expressly required by statute (or, in the case of Ohio, by common law) in all but nine of those states—the nine states that have retained the original language of the 1964 Model Bill.  As indicated in the cases cited above, courts in several of the states that have retained the original language of the 1964 Model Bill—Illinois, Massachusetts, Missouri, and New York— have applied a heightened standard for distinctiveness to those states' anti-dilution statutes.

As the foregoing discussion indicates, the issue of what degree of distinctiveness is required by the Delaware anti-dilution statute presents a difficult question given the paucity of authority under Delaware law, other states' interpretations of similar language, and the Restatement's view of the level of distinctiveness required under state anti-dilution laws.  For purposes of the present preliminary injunction proceeding, I will assume without deciding that ST's marks are sufficiently distinctive to qualify for protection under the Delaware anti-dilution statute.

### 3.   Dilution by Blurring

With respect to ST's claim of dilution by blurring, neither the Delaware anti-dilution statute nor any of the cases that have applied that statute have set forth a test for determining whether there is a likelihood of blurring in a particular case.  However, the 2006 amendments to the federal anti-dilution statute set forth a non-restrictive list of six factors that a court may consider when determining whether a defendant's mark or trade name is likely to cause dilution of a plaintiff's mark by blurring.  Those factors are similar to factors adopted by courts in analyzing state anti-dilution statutes as well as the original federal anti-dilution statute enacted in 1996, and they are

---

least in a particular product area or geographic region.  That requirement has variously been described as calling for the senior user's mark to be "famous," or "strong."  *See Universal Tire & Rollform Equip. Corp v. YouTube, Inc.*, 504 F. Supp. 2d 260, 267 (N.D. Ohio 2007).

appropriate to examine in considering whether bluebird's conduct violates the Delaware anti-dilution statute.[15]  The six factors set forth in the federal statute are as follows:

> (i) The degree of similarity between the mark or trade name and the famous mark;
> (ii) The degree of inherent or acquired distinctiveness of the famous mark;
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark;
> (iv) The degree of recognition of the famous mark;
> (v) Whether the user of the mark or trade name intended to create an association with the famous mark;
> (vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. §1125(c)(2)(B).

A brief assessment of each of these factors, as applied to the record evidence in this case, is as follows:

(i)  As discussed above in connection with ST's Lanham Act claim, both parties use the word "spark," so in that respect, the two marks are the same.  What is different is that ST uses the word "Spark" as its company name, while bluebird uses it not as a name at all, but as a verb or common noun in  slogans that are parts of its educational materials.

(ii)  The evidence in the record regarding ST's renown in the blood-disorder and gene-therapy communities suggests that ST may be able to establish secondary meaning in those fields.  Furthermore, ST's SPARK marks are suggestive, and they are therefore inherently distinctive, although not as strong as arbitrary or fanciful marks.

---

[15]  For example, in *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 168–69 (3d Cir. 2000), the Third Circuit adopted a generally similar set of factors in construing the 1996 federal anti-dilution statute.  The Second Circuit has employed generally similar factors in applying New York's anti-dilution law and the 1996 version of the federal anti-dilution statute.  *New York Stock Exch., Inc. v. New York New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002); *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 217–22 (2d Cir. 1999).

(iii)  The evidence does not show that ST is engaged in substantially exclusive use of the word "spark" as a trademark.  Bluebird has offered evidence that the word "spark" is frequently used by others in a trademark sense.  *See* Dkt. No. 52, Exhs. 9–13.  ST seeks to rebut that evidence by showing that many of the other uses are in fields other than the field of gene therapy.  But there are two answers to that argument.  First, for purposes of dilution analysis, the fact that a mark is used in other fields is relevant to whether the plaintiff's interest in the mark is subject to dilution. Second, some of the uses of the word "spark" to which bluebird alludes are in the healthcare field, including, in at least one case, in the field of gene therapy.

(iv)  ST has offered evidence that the SPARK marks are well known among physicians and researchers, particularly in the field of gene therapies for blood disorders.  *See* Dkt. Nos. 20 & 21. However, there is no evidence in the record regarding the degree of recognition of the SPARK marks among members of the general public.

(v)  There is no evidence in the record (or any basis from which to infer) that bluebird intended to create an association with ST's SPARK marks.

(vi)  There is no evidence in the record of any of actual association between bluebird's use of the word "spark" and ST's use of its SPARK marks.

An assessment of those factors leads to the conclusion that ST's claim that bluebird's use of the word "spark" in its educational materials has the effect of diluting ST's SPARK marks by blurring is not an especially strong one.  Moreover, as described below, some courts have considered the specific nature of the defendant's use in finding no likelihood of dilution by blurring.  The logic of those cases, if applied here, would counsel against a finding of dilution by blurring.

In *Barnes*, the district court noted that "[t]he defendant's use of its marks is visually distinct from [the plaintiff's] marks and thus tends to reinforce the distinction between the products." *Barnes*, 793 F. Supp. at 1304.  Here, bluebird uses the term "spark" as a common noun or verb in connection with other terms, as in "BE THE SPARK" or "SPARK ACTION."  ST, by contrast, uses the term SPARK as a proper noun alone or with non-descriptive matter, as in "SPARK," "SPARK THERAPEUTICS," or "SPARKMEDICAL.COM."  Those visual and grammatical distinctions counsel against a finding of blurring.

The First Circuit's analysis of the Massachusetts anti-dilution statute, which is identical to the Delaware statute, is also instructive on the issue of blurring.  In *Pignons S.A. de Mecanique v. Polaroid Corp.*, the court emphasized that the defendant's use of the word "Alpha" was not likely to dilute the plaintiff's mark "Alpa," because "Alpha" was "virtually a household word."  657 F.2d 482, 495 (1st Cir. 1980).  That was true despite the fact that, as the court explained, the plaintiff's mark was "relatively strong."  *Id.* at 491.  The court reasoned that dilution by blurring does not occur when the junior user's mark "is virtually a household word" and when numerous other commercial entities have used the same word to describe their products.  *Pignons*, 657 F.2d at 495.

A federal district court in Maine further endorsed that analysis in interpreting Maine's anti-dilution statute.  *Benchmark*, 2000 WL 1886570, at *7 ("[A] plaintiff cannot succeed on a theory of diminution in uniqueness and individuality of its mark when the mark in question—however distinctive for Lanham Act purposes—'is virtually a household word.'") (quoting *Pignons*, 657 F.2d at 495).

Here, because "spark" is a "household word" that companies engaged in cutting-edge science or technology might wish to use in describing their products or services, the consequences of providing protection for that term would be to restrict the English vocabulary useful in

commercial speech rather than to enhance it.  *See Pignons*, 657 F.2d at 495.  That concern is elevated given the large number of other entities that bluebird alleges use the term "spark" as part of their marks.  *See* Dkt. No. 26 at 17.

#### 4.  Dilution by Tarnishment

Although ST devotes most of its argument on dilution to contending that bluebird's "Be the Spark" campaign has led to blurring of the SPARK marks, it argues briefly that bluebird's activities have also led to the "tarnishment" of the SPARK marks, the other form of dilution that is typically addressed by anti-dilution statutes.  ST's tarnishment claim is based mainly on the fact that one of bluebird's clinical trials was terminated by the U.S. Food and Drug Administration because two of the subjects of the trial developed cancer.  *See* Dkt. No. 19 at 5, 9.  That is not a remotely sufficient showing to justify a preliminary injunction based on dilution by tarnishment.[16]

The relatively few cases in which claims of dilution by tarnishment have been upheld have typically involved instances in which the defendant has used the plaintiff's mark in "a clearly unwholesome or degrading context."  4 McCarthy on Trademarks § 24:88 at 24-288.  What is required to establish a claim of tarnishment is for the plaintiff to show that the defendant's use of the plaintiff's mark "is likely to come to the attention of the prior user's prospective purchasers and that the use is likely to undermine or damage the positive associations evoked by the mark."  Restatement (Third) of Unfair Competition § 25, cmt. g.  ST has not shown that bluebird's clinical trial produced the kind of negative reaction in the relevant community of either physicians or patients that could reasonably be expected to have resulted in a negative impact on the goodwill associated with ST's SPARK marks.

---

[16]  In support of  its tarnishment argument, ST also asserts that bluebird "removed certain therapies from European markets after disputes with European regulators."  Dkt. No. 19 at 5.  That unelaborated observation contributes nothing of substance to ST's tarnishment argument.

As the foregoing analysis indicates, ST's showing on the dilution issue, like its showing on the issue of likelihood of confusion, is not particularly strong and is likely to be met by significant challenges.  However, in light of the low bar set by the Third Circuit in *Reilly*, I am persuaded that ST has shown that it has a "significantly better than negligible" chance of succeeding on the merits of its claim of dilution by blurring given the shared use of the term "spark" by ST and bluebird and the strength of ST's SPARK marks.  *Reilly*, 838 F.3d at 179.  I therefore need to address the remaining factors bearing on the availability of preliminary injunctive relief with respect to both ST's Lanham Act claim of likelihood of confusion and its claim of dilution under the Delaware Trademark Act.

IV.     Irreparable Harm

ST argues that it can demonstrate the irreparable harm required to justify a preliminary injunction merely by showing that it has a likelihood of success on the merits.  In response to cases holding that irreparable harm is not presumed in Lanham Act cases, such as *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 216 (3d Cir. 2014), *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011), and *N. Am. Med. Corp. v. Axion Worldwide, Inc.*, 522 F.3d 1211, 1227–28 (11th Cir. 2008), Congress in late 2020 amended section 34(a) of the Lanham Act, 15 U.S.C. § 1116(a), to provide that a plaintiff seeking an injunction for violations of, *inter alia,* section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),

> shall be entitled to a presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order.

Trademark Modernization Act of 2020 (part of the Consolidated Appropriations Act of 2020), Pub. L. No. 116-260, Div. Q,  tit. II, § 226(a), 134 Stat. 2208 (Dec. 27, 2020).

Bluebird's primary argument against applying the statutory presumption is that the presumption "does not apply here because [ST] has not acted diligently in policing its mark." Dkt. No. 26 at 20.  While unreasonable delay in seeking injunctive relief can defeat a movant's claim of irreparable harm, the presence of delay is more aptly characterized as a factor rebutting the presumption of irreparable harm, rather than as a reason that the presumption should not apply in the first place.  *See, e.g.*, *Massimo Motor Sports LLC v. Shandong Odes Indus. Co.*, No. 3:21-CV-2180, 2021 WL 6135455, at *2 (N.D. Tex. Dec. 28, 2021); *Icleen v. Entwicklungs und Vertiebsanstalt für Umweltprodukte*, No. CV 21-2236, 2021 WL 6104397, at *12 (C.D. Cal. Oct. 4, 2021); *A-76 Techs., Inc. v. Mass Mgmt., LLC*, No. 4:21-CV-923, 2021 WL 6202654, at *2 (S.D. Tex. Sept. 7, 2021).

In any event, ST's delay in seeking injunctive relief is not enough to defeat a showing of irreparable harm on the record before me.  ST asserts that it was unaware of bluebird's "Be the Spark" campaign for more than a year after the campaign was initiated, and bluebird points to no contrary evidence.  Therefore, that period of delay may speak to the lack of overlap between the two companies' activities, but it does not constitute chargeable delay on ST's part in seeking to protect its rights with respect to bluebird's campaign.  That leaves the period of just under three months after ST filed this action and before it filed its motion for a preliminary injunction.  Three months is not an unreasonably long period in which to prepare a preliminary injunction motion together with a detailed brief, exhibits, and an expert report.  That is particularly true because, as ST represents, it was seeking an informal resolution of the dispute during that period.  *See Inflight Newspapers, Inc. v. Mags. In-Flight, LLC*, 990 F. Supp. 119, 124 (E.D.N.Y. 1997).  Under the circumstances, this is not a case in which the plaintiff can be accused of sleeping on its rights.  *See*

*Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015); *see also Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 169 (3d Cir. 2000); *Kos*, 369 F.3d at 727.

The extent to which the rebuttable presumption of irreparable injury applies in this case is unclear, but for a different reason. The 2020 statute provides that the presumption will apply "upon a finding of likelihood of success on the merits." It is clear that the presumption of irreparable harm would apply if the court (or a jury) were to find that the plaintiff has shown that it is more likely than not that it will prevail on the merits. However, the statute does not address whether the presumption would apply if the plaintiff has not shown a likelihood of success by a preponderance of the evidence, but has only shown that it has a significantly greater than negligible chance of success on the merits, the minimum necessary to obtain a preliminary injunction under Third Circuit law.

There is little case law addressing that question, and what there is goes in opposite directions. A district court in California stated that the presumption applies only upon a finding of a likelihood of success and "would not seem to apply to a situation in which a plaintiff raises merely 'serious questions' as to the merits under the Ninth Circuit's sliding scale approach" to the likelihood of success in a preliminary injunction setting. *Zamfir v. Casperlabs, LLC*, 528 F. Supp. 3d 1136, 1150 (S.D. Cal. 2021). Other courts have taken the opposite position. A district court in Wisconsin construed the 2020 statute to mean that a preliminary injunction movant is entitled to a presumption of irreparable harm by demonstrating "a greater than negligible chance of prevailing on the merits." *Kohler Co. v. Whistling Oak Apartments LLC*, No. 20-CV-1563, 2021 WL 2434203, at *9 (E.D. Wis. June 14, 2021). And a district court in Iowa ruled that a plaintiff was entitled to the statutory presumption of irreparable harm upon a showing of only "a fair chance of

prevailing on its trademark infringement claim at trial." *Moon Seed LLC v. Weidner*, No. 3:20-cv-104, 2021 WL 2627455, at *6 (S.D. Iowa Apr. 22, 2021).

For purposes of this case, it is not necessary to decide that question. I will assume that irreparable harm is presumed upon a finding of a merely non-negligible likelihood of success, that ST has satisfied that standard with regard to its likelihood of confusion claim, and that bluebird has not rebutted the presumption.

As for the dilution claim, there is no statutory presumption of irreparable harm under Delaware law. ST argues that "irreparable harm does not need to be proven under the DTA because the statute expressly authorizes an injunction." Dkt. No. 32 at 9. ST points to language in the statute stating that a likelihood of dilution "shall be a ground for injunctive relief." *Id.* at 9 n.4. But authorizing a court to issue an injunction is quite different from mandating the court to issue injunctive relief. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."). As the Supreme Court held in *Hecht Co. v. Bowles*, language such as that found in the Delaware Trademark Act is insufficient to compel a court to issue an injunction without balancing the equities. 321 U.S. 321, 327–28 (1944) (holding that even statutory language stating that an injunction "shall be granted" under proof of a statutory violation does not require the court to issue an injunction); *see also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 60–61 (1975).[17]

---

[17] To the extent ST argues that the Delaware Trademark Act requires this court, applying state law, to issue an injunction, the answer is that under the principles of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), as applied in *Hanna v. Plumer*, 380 U.S. 460 (1965), state law does not govern a federal court's exercise of its discretion to issue or deny preliminary injunctive relief

In the absence of a statutory presumption of irreparable harm, ST must establish a likelihood, not just a possibility, of irreparable harm from the dilution of its state law trademark rights. *See Reilly*, 858 F.3d at 179 (showing of irreparable harm must be "more likely than not"); *Ferring*, 765 F.3d at 217. ST's showing of irreparable harm essentially amounts to speculation regarding the potential "loss of control over reputation" and the fact that such harm, if it occurred, would be "impossible to quantify." Dkt. No. 32 at 9. While it may be that any harm to ST would not be compensable in damages, ST's argument goes beyond that; ST contends that it has shown irreparable injury because it will suffer significant injury absent an injunction. But ST has offered no evidence indicating the extent of the harm that has resulted from bluebird's alleged dilution of the SPARK marks, or even that such harm has resulted at all. ST's showing is insufficient to establish that ST is more likely than not to suffer irreparable harm from any violation of the Delaware anti-dilution statute.

Accordingly, ST's motion for a preliminary injunction fails as to its Delaware Trademark Act claim because it has not established irreparable harm as to that claim. *See Reilly*, 858 F.3d at 179. Because ST is entitled to a presumption of irreparable harm on its Lanham Act claim, however, I address the remaining preliminary injunction factors below.

---

in connection with a state law claim. As the Third Circuit has held, "[a]lthough the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions." *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1141 (3d Cir. 1977); *see also Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799–800 & n.4 (3d Cir. 1989) (same); *LuLu Shriners v. Twp. of Whitemarsh*, No. CV 20-1720, 2021 WL 3885127, at *6 n.11 (E.D. Pa. Aug. 31, 2021) ("But when analyzing whether [plaintiff] is entitled to an injunction, we apply a federal, not state, standard.").

V.     Balance of Hardships

Having found that ST has satisfied the first two preliminary injunction elements as to its Lanham Act claim, I must weigh the remaining two factors: the balance of hardships and the public interest as to that claim.

With regard to the respective hardships asserted by the parties, ST argues that absent a preliminary injunction it will suffer injury in the form of consumer confusion. But ST has not provided any argument or evidence as to the nature or degree of such injury. In addressing the balance of hardships, it is not sufficient for the party seeking injunctive relief simply to say that absent an injunction it will suffer irreparable injury, i.e., an injury that cannot be fully remedied by an award of damages. Instead, the court must weigh the injury to the defendant that would result from issuance of an injunction against the injury that the plaintiff would suffer from denial of the injunction. *See Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016) ("We must next balance the irreparable harms we have identified against the harm to defendants if the preliminary injunction is granted.") (citation omitted).

The effect on ST of denying a preliminary injunction is that ST would be required to wait until a final judgment in this case to require bluebird to alter its "Be the Spark" campaign. ST contends that the consequence of postponing injunctive relief for that period would be that it would suffer serious and enduring injury. Yet ST has not produced any evidence that anyone, whether a physician, a prospective patient, an investor, or other person, has been confused by bluebird's "Be the Spark" campaign. Although ST is entitled to a presumption of irreparable injury based on its showing as to a likelihood of confusion, the presumption does not entitle ST to claim the upper hand in the balance of hardships. *See Winter*, 555 U.S. at 23 ("[E]ven if plaintiffs have shown irreparable injury from the [defendants' activities], any such injury is outweighed by the public

interest and the [defendants'] interest . . . ."); *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 587 (S.D.N.Y. 2009) ("While I have assumed that there is some possibility of irreparable harm, the nature and extent of any such harm is quite speculative.  It surely cannot be assumed to outweigh the hardship likely to confront [the defendant] in the event he were wrongfully enjoined."); *Edge Wireless, LLC v. U.S. Cellular Corp.*, 312 F. Supp. 2d 1325, 1335 (D. Or. 2003) (holding, in a trademark case, that even presuming irreparable injury, the balance of hardships weighed against granting an injunction).  In light of the record in the preliminary injunction proceedings, ST has not offered any evidentiary basis for its assertion of serious harm, a failing that is particularly telling in light of the limited strength of its claim on the merits.

At the preliminary injunction hearing, ST argued that bluebird's campaign was a form of "pre-marketing" for bluebird's SCD gene therapy treatment that is currently in development. However, bluebird's use at present is limited to its educational campaign, and particularly the patient website and the video identified by ST.  If bluebird were to use the term "spark" as a brand name for its SCD gene therapy product, or in connection with clinical trials for that product, the risk of harm to ST, and the likelihood of confusion, might well be greater and more concrete.  But the possibility of that future injury is purely speculative and does not factor into the preliminary injunction analysis at this point.[18]

The harm to bluebird, on the other hand, is more concrete.  If ST prevails in this action, or even on its motion for a preliminary injunction, bluebird will have to terminate, or at least significantly modify, its "Be the Spark" campaign.  That will entail revising its patient website and

---

[18]  More generally, this decision is predicated on the facts on the record and judicially noticed by the court as of the date of this order.  Of course, if circumstances change, such as if bluebird's use of the term "spark" changes in nature or becomes significantly more expansive between now and the time of trial, the court can revisit the question whether preliminary injunctive relief should be granted.

video as well as the associated brochures, and abandoning or substantially altering the "Be the Spark" theme that runs those materials.

Frankly, neither consequence seems dire for either party as things stand currently. From the showing made by the parties, I am not persuaded that a delay in the availability of injunctive relief to ST would lead to serious injury to ST. On the other hand, I am also not persuaded that an injunction temporarily halting bluebird's "Be the Spark" campaign, or—more likely—requiring that it revise its educational program, would be exceptionally damaging to bluebird. Nevertheless, I find that the quantum of prospective harm is greater for bluebird than for ST, given the wholly speculative nature of the injury ST alleges. I therefore find that the balance of equities weighs against entering a preliminary injunction.

V.      The Public Interest

ST argues that the public interest would be damaged by allowing bluebird to use the word "spark" in a manner that is likely to cause confusion, an interest that is heightened in the health care industry. Because neither party now produces an approved therapy in the field in which their research has some degree of overlap, the public interest is not likely to be significantly affected by the denial of a preliminary injunction in this case. By contrast, bluebird's campaign serves an important interest in raising awareness regarding SCD, and entering an injunction may at least temporarily "remove [those] resource[s] from the SCD community," as bluebird argues. *See* Dkt. No. 26 at 20. I therefore conclude that the public interest factor weighs somewhat against entering a preliminary injunction.

VI.     Balancing the Factors

When a plaintiff meets its burden as to the first two *Winter* factors (likelihood of success and irreparable harm), the court must exercise its discretion in weighing the four factors to

determine whether to grant the requested preliminary relief." *Reilly*, 858 F.3d at 179.  As discussed above, the two remaining factors (the balance of hardships and the public interest) weigh against a preliminary injunction, even though the potential harm resulting to either party is limited.

As the Third Circuit has observed, "[h]ow strong a claim on the merits is enough depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* (citation omitted). ST's Lanham Act claim has a reasonable chance of success, but is not necessarily more likely than not to succeed on the merits.  By contrast, the net harm to ST that a preliminary injunction would prevent is speculative and, at best, limited.  When the balance of hardships and public interest are weighed against ST's likelihood of success on the merits, I find that ST has not established that it is entitled to the extraordinary remedy it seeks.

Because ST has failed to establish its right to a preliminary injunction in this case, the motion for a preliminary injunction is denied.

IT IS SO ORDERED.

SIGNED this 25th day of January, 2022.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE